No. 01-373

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 34

GRAVELEY SIMMENTAL RANCH CO.,
CLIFFORD E. GRAVELEY, McINTOSH
RANCH, a partnership, and WILLIAM
McINTOSH,

        Plaintiffs and Respondents and Cross-Appellants,

    v.

JAMES C. QUIGLEY,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
                In and for the County of Powell, Docket No. DV-95-119
                The Honorable Ted L. Mizner, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Holly Jo Franz, Gough, Shanahan, Johnson & Waterman, Helena,
                Montana

        For Respondents:

                Leanne M. Schraudner, Schraudner & Hillier, Bozeman, Montana

Submitted on Briefs:  February 28, 2002

Decided:  February 26, 2003

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      This case arises out of a landslide occurring between two irrigation ditches near Avon, Montana. The Third Judicial District Court in Powell County, Montana, assigned joint liability for the damage caused by the landslide to the two ditch owners, Clifford Graveley (Graveley)[1] and James Quigley (Quigley), and required that Quigley pay some of Graveley's attorney's fees. The District Court also issued rulings on Quigley's existing easement rights as they pertain to Graveley's and William McIntosh's (McIntosh)[2] property. The parties appeal and cross-appeal. We reverse in part and affirm in part.

**ISSUES**

¶2      The parties challenged several aspects of the District Court's ruling. A restatement of the issues is:

        1.      Did the District Court err in concluding that all previous court cases limited the capacity of Quigley's irrigation ditch easement to 800 miner's inches?

        2.      Did the District Court erroneously limit Quigley's secondary ditch easement rights?

        3.      Did the District Court err by apportioning equal fault for the damages caused by the landslide to Graveley and Quigley?

---

        [1]      For purposes of simplicity, Graveley and his predecessors will be referred to as Graveley. The same shall be applied for Quigley and McIntosh.

        [2] The landslide occurred on Graveley land and no McIntosh land was damaged as a result of the landslide, but because McIntosh has been a party to the majority of previous lawsuits involving Graveley and Quigley and because Quigley's easement rights applicable to McIntosh's land are addressed in this case, McIntosh is a party. The majority of this Opinion, however, pertains to claims between Quigley and Graveley.

4.      Did the District Court erroneously require Quigley to pay some of Graveley's attorney's fees?

5.      Did the District Court err in refusing to grant a new trial on the injunction temporarily limiting Quigley's ditch flow to 400 miner's inches?

6.      Did the District Court err in its award of damages to both parties?

¶3      We address each of these issues below.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4      The history of these families and their claims to water rights from Ophir Creek is long and colorful.  Since 1865, at the latest, a Quigley has claimed a legal right to water flowing through Ophir Creek in Powell County, Montana, and has protected that legal right through litigation.  *Quigley v. Birdseye* (1892), 11 Mont. 439, 28 P. 741.  Graveley and McIntosh first appeared as named parties protecting their water rights from this creek in the 1928 case, *Quigley v. Victor Gold Mining Co.*, Cause No. 1185 (MT 3rd Jud. Dist.).  These three families have pursued their litigious protection of this valuable water source through numerous Powell County lawsuits, three of which ultimately reached this Court.  *See Quigley v. McIntosh* (1930), 88 Mont. 103, 290 P. 266; *Quigley v. McIntosh* (1940), 110 Mont. 495, 103 P.2d 1067; *Graveley v. Quigley* (1963), 142 Mont. 596, 386 P.2d 60.

¶5      In the *Victor Gold Mining* case, the court in Powell County set out the Ophir Creek water rights of various families.  The court recognized that the Quigley family had established the right to 25 miner's inches of Ophir Creek water in 1865 and another 100 miner's inches in 1912.  During those early years, the Quigley family used a then-existing ditch to divert water from Ophir Creek.  In 1911, however, they constructed the currently

3

existing ditch (Quigley ditch or Quigley Ophir Creek ditch), which has been used without interruption since its construction. The Quigley ditch conveys water from Ophir Creek across the land of various landowners, including Graveley and McIntosh, and terminates on the Quigley property in the Three Mile Creek drainage area.

¶6      In 1929, Quigley's predecessor in interest filed a petition to appropriate 800 miner's inches from Ophir Creek. *Quigley v. McIntosh* (1930), Cause No. 2038 (MT 3rd. Jud. Dist.). As part of the appropriation proceeding, Quigley's ancestor hired E. J. Strasburger (Strasburger), a civil and mining engineer, to survey the Quigley Ophir Creek ditch. In its Findings of Fact and Conclusions of Law, the Third Judicial District Court granted and decreed that Quigley was entitled to 800 inches of Ophir Creek water. The court adopted Strasburger's survey description of the Quigley ditch as having a "carrying capacity of eight hundred miners' inches." The court then expressly permitted Quigley to divert and convey water from Ophir Creek through the Quigley ditch "to the extent of eight hundred inches."

¶7      In 1960, Graveley and McIntosh filed two lawsuits against Quigley in the Powell County court. In one suit, *Graveley and McIntosh v. Quigley*, Cause No. 4234 (MT 3rd Jud. Dist.), Graveley and McIntosh sought to establish themselves as the rightful owners of the Quigley Ophir Creek ditch. Also, in October 1960, Graveley and McIntosh obtained a temporary restraining order (TRO) to prohibit Quigley's father, Clifford, from enlarging the Quigley ditch as he was cleaning it. *Graveley and McIntosh v. Quigley*, Cause No. 4311 (MT 3rd Jud. Dist.). After a show cause hearing, an Injunction Pendente Lite in Cause No. 4311 was issued in December 1960, prohibiting Quigley from expanding the ditch beyond

4

its dimensions as described in previous cases. However, the Injunction mistakenly described the ditch's capacity as 500 miner's inches. As a result of the TRO and Injunction, Clifford Quigley ceased cleaning operations of his ditch. While Cause No. 4311 was pending, the court decided Cause No. 4234 and issued its Order in March 1962.

¶8 Prior to the Cause No. 4234 Order being issued, however, Graveley constructed his own ditch off of Ophir Creek in 1961. The Graveley Ophir ditch (Graveley ditch), which is smaller than the Quigley ditch and taps Ophir Creek near where the Quigley ditch taps the creek, is located below the Quigley ditch and generally follows the same course as the Quigley ditch.

¶9 The March 1962 ruling in Cause No. 4234 established that Quigley was the rightful owner of the Quigley Ophir Creek ditch and prohibited Graveley and McIntosh from using the ditch. (Graveley and McIntosh appealed this Order but the Montana Supreme Court affirmed the District Court. *See Graveley v. Quigley* (1963), 142 Mont. 596, 386 P.2d 60.) In addition, the court defined, in its Finding number three, the dimensions of the Quigley ditch as "six feet in width on the bottom and nine feet in width on top, and is two feet in depth" and having a "carrying capacity of 800 miners' inches." It based the description and capacity on the 1930 Decree and Judgment in Cause No. 2038. The court then stated in its Conclusions of Law that Quigley was the owner of the Ophir Creek Ditch "described more particularly in the Court's Finding number three, and have the right to flow 925 inches of the waters of Ophir Creek in and through said ditch."

¶10 After Cause No. 4234 was appealed and resolved, Quigley turned his attention back

5

to Cause No. 4311 which had been pending since 1960. By way of a June 1965 motion and affidavit of Clifford Quigley, Quigley sought to have the Injunction Pendente Lite modified to change the ditch's carrying capacity from 500 miner's inches to 800. Graveley and McIntosh objected to the modification. The court held a show cause hearing and on June 25, 1965, entered an Order and Injunction in Cause No. 4311. The Order modified the Quigley ditch carrying capacity from 500 to 800 miner's inches and enjoined Quigley from expanding the ditch beyond the dimensions described in previous cases. Moreover, the Order defined, in detail, the extent of Quigley's ditch easement, including the secondary easement for maintenance and access. Quigley, thereafter, posted the $5000 bond required by the Order which allowed him to return to the ditch cleaning and maintenance project that had triggered the lawsuit. He was bound this time, however, by the conditions set out in the Order and Injunction. No final hearing was ever held on the merits of Cause No. 4311 nor was any final order or judgment entered. It appears that the ditch has been maintained by Quigley in accordance with the 1965 Order since that time.

¶11 The District Court in the case at bar found that the 1965 Order is not legally binding because the case was never pursued to finality. It nevertheless redefined Quigley's secondary easement rights, as to inspection, repair, maintenance, and operation of the ditch, to be the same as those set out in the 1965 Order.

¶12 In 1982, all water users filed statements of claim for their water rights. Quigley filed a claim for an 800 inch water right from Ophir Creek with a 1928 priority date. At some time between 1982 and 1993, Graveley filed an objection with the Water Court to Quigley's

6

1982 claim for 800 miner's inches. During 1993, while awaiting a hearing date with the Water Court, Graveley embarked on a substantial remodeling of his ditch. Because part of the Graveley ditch constructed in 1961 ran at a relatively flat grade, Graveley moved this portion of his ditch farther uphill and considerably closer to Quigley's ditch to obtain a better grade. This remodeling activity was extensive and significantly changed the contours and stability of the hillside. By the spring of 1994, a portion of Graveley's new ditch had settled downward. To resolve this problem, Graveley put in eight feet of pipeline across the settled area.

¶13     The Water Court, in March 1994, dismissed Graveley's objection to Quigley's claim for 800 miner's inches of water on *res judicata* grounds, *i.e.*, Quigley's flow rate had been established by a final decree in a previous litigation in which Graveley's predecessor was a party. It found that the failure of Graveley's predecessor to object to the established flow rate during the earlier case barred Graveley from objecting to it in 1994. However, the Water Court then recited, generally, the various available legal theories that could be used to object to a decreed right, one of which was a reduction in a decreed water right based on non-use or abandonment.

¶14     During the District Court hearing for the case at bar, there was extensive testimony regarding the volume of water Quigley and his predecessors historically transported through their Ophir Creek ditch. While Quigley testified that he and his father always knew water rights were "use them or lose them" rights, Graveley and McIntosh testified that prior to the 1993 Water Court challenge to Quigley's 800 miner's inches, they had never observed more

7

than 500 miner's inches running through the Quigley ditch. Moreover, Quigley's own pre-1993 records revealed only rare occasions when his ditch diverted more than 500 inches. Quigley testified that he did not consider the Water Court proceeding to be an abandonment proceeding and admitted that beginning in 1993, he significantly increased the flows through his ditch but that he did so because water availability had improved from the previously dry years. The District Court found, however, that Quigley increased his flows to eliminate potential claims that he had abandoned his right to an 800 inch flow rate. Quigley continued to run high volumes of water through his ditch periodically through the 1994 and 1995 irrigation seasons. Water Commission records, from both 1994 and 1995, reflected several days in which flows through the Quigley ditch measured between 600 and 813 miner's inches.

¶15    From the construction of the Quigley ditch in 1911 until 1948, it appears there were no operational problems with the ditch. In 1948, however, the ditch failed following a heavy, late-spring snowfall, during which the water to the ditch was not turned off. The melted snow combined with the water flow from Ophir Creek caused the ditch to wash out on the portion that traverses the Graveley property. Between the 1948 washout and 1994, when the ditch historically ran fewer than 500 inches of water, there were no problems. On May 15, 1994, after Quigley had been running more than 600 miner's inches through the ditch for four consecutive days, it was discovered that the Powell County road running adjacent to the Quigley ditch was saturated and seriously damaged. Quigley promptly reduced his flows to less than 400 miner's inches and ultimately to less than 300 inches.

8

Quigley did not increase his flows again until the spring of 1995.

¶16 In April 1995, Quigley began diverting Ophir Creek water into his ditch. He adhered to what he called standard procedure and walked the length of his ditch after the flow began. The purpose of this was to locate and repair gopher holes, remove any debris that might have accumulated, and generally, identify and address any potential problems with the ditch.

¶17 Between May 1 and May 8, 1995, Quigley's flows fluctuated between 123 miner's inches and 274 miner's inches. On May 9, they began climbing and by May 19, had reached a flow of 813 miner's inches. For the following three days leading to May 23, 1995, the ditch carried between 777 and 786 inches of water. On May 23, at the same location where the 1948 washout occurred and near the area where Graveley remodeled his ditch, the land just below the Quigley ditch slid and the Quigley ditch broke, sending a flood of water down Graveley's hillside, creating an erosional gully, filling in ponds, destroying Graveley's ditch and causing several thousand dollars worth of damage. This landslide prompted the filing of the instant case.

¶18 The District Court's Findings of Fact and Conclusions of Law from which this appeal is taken, are set forth under the various "Issue" categories below.

## STANDARD OF REVIEW

¶19 This Court reviews the findings of a trial court sitting without a jury to determine if the court's findings are clearly erroneous. Rule 52(a), M.R.Civ.P. A district court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the trial court has misapprehended the effect of the evidence, or if a review of the record leaves this

9

Court with the definite and firm conviction that a mistake has been committed. *Guthrie v. Hardy,* 2001 MT 122,  305 Mont. 367, 28 P.3d 467 (*citing Engel v. Gampp*, 2000 MT 17, 298 Mont. 116,  993 P.2d 701).  Additionally, we review a district court's conclusions of law to determine whether those conclusions are correct. *Guthrie*, ¶ 24 (citation omitted).

¶20     Furthermore, we review a district court's denial of a Rule 59, M.R.Civ.P., motion for a new trial on the grounds enumerated in § 25-11-102, MCA, for an abuse of discretion. *Lopez v. Josephson*, 2001 MT 133, 305 Mont. 446, 30 P.3d 326 (*citing Armstrong v. Gondeiro*, 2000 MT 326, ¶ 17, 303 Mont. 37, ¶ 17, 15 P.3d 386, ¶ 17).  The decision to grant or deny a new trial is within the sound discretion of the trial judge and will not be disturbed absent a showing of manifest abuse of that discretion.  *Lopez, ¶ 16* (citation omitted).  The standard requires that the abuse of discretion be so significant as to materially affect the substantial rights of the complaining party.  *Lopez, ¶* 16 (citation omitted).

¶21     Lastly, we also apply the "abuse of discretion" standard to our review of an award of damages.  *Sletteland v. Roberts*, 2000 MT 382, ¶ 36, 304 Mont. 21, ¶ 36, 16 P.3d 1062, ¶ 36 (*citing Edington v. Creek Oil Co.* (1984), 213 Mont. 112, 127, 690 P.2d 970, 978).  In all cases, damages must be reasonable.  Section 27-1-302, MCA.

## DISCUSSION

¶22     *Issue 1*:  **Did the District Court err in concluding that all previous court cases limited the capacity of Quigley's irrigation ditch easement to 800 miner's inches?**

¶23     The District Court in its Findings of Fact recognized that Quigley had been granted in various years three respective water rights of--25 inches, 100 inches and 800 inches--for

a total of 925 inches.  The court also stated in its Findings that each of these rights could be delivered to Quigley's property through the Quigley Ophir Creek ditch but that the capacity of the ditch limited transport at any one time to 800 inches.  Subsequently, in the court's Conclusions of Law, it held:

> The Court concludes based on the previous court decisions involving these parties that the Quigley ditch easement is for 800 inches of water at any one time.  Although the Quigley's [sic] apparently have 925 miners inches of water from Ophir Creek, the ditch easement is restricted to 800 inches at any one time unless there are circumstances such as appear before the Court at the present time which warrant further restriction of the water flow in Quigley's ditch in an effort to prevent further injury to the Plaintiffs.

¶24    Quigley argues that the court misunderstood previous court decisions.  He claims that the 1928 and 1930 cases determined his family's water rights to be 925 inches but did not determine the easement rights pertaining to transporting this quantity of water.  He maintains that it was the 1962 case, Cause No. 4234, subsequently affirmed by this Court in *Graveley v. Quigley* (1963), 142 Mont. 596, 386 P.2d 60, that established his right to flow his entire water rights of 925 miner's inches through his ditch.  We agree with Quigley's characterization of the 1928 case in which it was established that his family had two water claims, totaling 125 miner's inches, from Ophir Creek.  We disagree with his interpretation of both the 1930 and 1962 cases.

¶25    In Cause No. 2038 (1930), the Third Judicial District Court granted Quigley's request for 800 miner's inches.  During that proceeding, the District Court reviewed Quigley's 1928 survey of the ditch and heard the surveyor's testimony.  In its Findings of Fact and Conclusions of Law,  the court provided a legal description of the ditch and declared that the

11

ditch had a carrying capacity of 800 miner's inches. Presumably the court used the best evidence presented to it to develop this description and the only evidence to which the court specifically referred in the Findings and Conclusions was Strasburger's survey. The parties did not appeal this decision.

¶26 Interpreting the court's language in its plain, everyday use, this quite simply means that the ditch is capable of transporting a maximum of 800 inches of water at any one time. Based on this description, the District Court in its 1930 Opinion expressly held that Quigley was "entitled to a decree herein awarding and decreeing to him the right to divert said water from Ophir Creek at the headgate and point of diversion described in the Findings of Fact foregoing, and to convey the same to the **extent of eight hundred miners' inches**, . . ., through the ditch described in said Findings of Fact, to his land. . . ." (Emphasis provided). Quigley's predecessors did not challenge this ruling nor seek to have it modified.

¶27 Subsequently, in Cause No. 4234 (1962), the same court determined Quigley to be the rightful owner of the Quigley Ophir Creek ditch and prohibited Graveley and McIntosh from using the ditch to convey their water rights from Ophir Creek to their properties. Quigley, to support his current claim that he may transport the full 925 inches through the ditch at one time, relies on Conclusion of Law No. 1 in Cause No. 4234 which reads:

> That the defendants, Clifford Quigley and Esther Quigley, are the owners of the ditch variously referred to as the Ophir Ditch, Ophir-Quigley Ditch, Quigley Ditch and China Ditch, and described more particularly in the Court's Finding number three, and have the right to flow 925 inches of the water of Ophir Creek in and through said ditch.

Finding number three, referenced in the court's legal conclusion, contained the previously-

used description, "[s]aid ditch has a carrying capacity of 800 miners' inches . . . ."

¶28     Quigley argues that this 1962 legal conclusion grants him the right to run the total of his 925 miner's inches of water rights through his ditch at any one time and therefore Graveley is barred, on *res judicata* grounds, from attempting to limit him to transporting 800 miner's inches or less, at any one time.  Additionally, Quigley asserts that there is no ambiguity or confusion in Conclusion of Law No. 1.  While the language of the 1962 court's Conclusion of Law No. 1 does appear unambiguous, it is irreconcilable with the unchallenged and oft-stated capacity of the ditch.  Therefore, we believe it must be interpreted logically, using common sense and in a manner consistent with previous proceedings.

¶29     The language describing the Quigley ditch as having a capacity of 800 miner's inches has consistently been used in proceedings between these parties or their predecessors since they were first uttered in 1928.  Until the case at bar, no Quigley has ever challenged its use or meaning despite the opportunity to do so in numerous cases.

¶30     Additionally, Quigley argues that Strasburger's language has been misunderstood and that his testimony in the 1962 proceeding, during which he relied on his 1928 field notes, proves that the ditch has much greater carrying capacity than 800 inches and, therefore, could accommodate his full 925 inches.  We agree that Strasburger testified that there were locations along the Quigley ditch with capacities ranging from 1,059 to 2,160 miner's inches.  We note, however, that Strasburger also testified that at one surveyed location the carrying capacity of the ditch was only 871 miner's inches.  Additionally, Strasburger did not survey

13

the entire Quigley ditch. As indicated in the ditch description, the Quigley ditch traverses Sections 25 through 30 of Township 11 North, Range 8 West. Strasburger surveyed only one-half of the ditch, Sections 25 through 27. We also note that the record in this case contains claims that at any given location along the Quigley ditch, the capacity of the ditch can be from 800 miner's inches to 6,200 miner's inches. Because it is elementary that a ditch cannot carry more water than its smallest dimensions can convey, it defies logic for this Court or any other court to allow 925 miner's inches of water to be transported through a ditch that, in at least one place if not several, has a capacity of less than 925 miner's inches. We therefore interpret the court's 1962 ruling as recognizing that while the Quigley family has the right to divert 925 miner's inches of water from Ophir Creek, such rights are subject to the ditch description in Finding of Fact No. 3, which clearly states the ditch had an 800 miner's inch carrying capacity.

¶31    Lastly, the dissent, in paragraph 65, finds significance in a statement made by the 1962 District Court, Cause No. 4234, in Finding of Fact No. 3 immediately following the legal description of the Quigley ditch. Justice Trieweiler interprets the referenced statement to indicate that the 1962 court did not intend to be bound by its legal description to the extent that the legal description was inconsistent with Strasburger's survey and map prepared for and submitted in the 1930 case, Cause No. 2038. As indicated above, the court in Cause No. 2038 utilized both Strasburger's survey as well as his testimony when it presented the legal description in its 1930 Findings of Fact and Conclusions of Law. Accordingly, we do not believe the language of the 1962 court order upon which the dissent relies, to be dispositive

14

of the capacity of the ditch at issue.

¶32     Since 1930, this ditch has been described in the orders and judgments of various legal proceedings between these parties as having a carrying capacity of 800 miner's inches. Moreover, based upon generations of Quigleys not challenging this description but rather using it to their respective benefits, under the principle of *res judicata*, Quigley cannot now be heard to complain of its inaccuracy.  We therefore affirm the District Court on this issue.

¶33     *Issue 2*: **Did the District Court erroneously limit Quigley's secondary ditch easement rights?**

¶34     Quigley's secondary easement dictates Quigley's right to enter the property of other landowners to inspect, repair and maintain his ditch.  These rights were defined with substantial specificity in the 1965 Order in Cause No. 4311.  While the District Court found that this 1965 Order was not legally binding, it nevertheless issued the following Finding of Fact:

> Quigley's historical use and maintenance of the ditch have determined the scope of Quigley's secondary easement so that inspection, repair, maintenance and operations on the ditch by Quigley's [sic] shall essentially be as set forth in the 1965 Order and more specifically defined herein.

The court then expressly defined Quigley's secondary easement which included limiting the size of machinery Quigley could use to repair and maintain his ditch to machinery no greater than six feet in width; allowing Quigley to breach Graveley's fences as necessary but requiring prompt repair of the breached fences; and allowing Quigley access to his ditch on Graveley's property by specific routes and with specific vehicles, *i.e*., a "four wheeler" or smaller.  The court also mandated that repairs and maintenance be accomplished using the

original ditch easement.

¶35 Quigley argues that his easement should not limit the size of equipment he uses to repair or maintain his ditch except for equipment that must be placed in the ditch bottom during maintenance. He correctly states that the only equipment size restriction in the 1965 Order prohibited Quigley from using equipment in the ditch bottom that was greater than six feet in width, or equipment that would require a ditch larger than the Quigley ditch or would inevitably create a ditch larger than the Quigley ditch's allowable specifications. He maintains that limiting him to using repair and maintenance equipment that is no greater than six feet in width exposes him to danger, and that the court's limitation on such equipment is not supported by the evidence. He further protests that there are places where the Graveley and Quigley ditches are so close together that working along the banks of the ditch with a potentially unstable backhoe is dangerous and provides no space to place the debris removed from the ditch. Moreover, he argues that using an excavator with an eleven foot footprint allows for faster cleaning, is less dangerous, and that the cleaning bucket is only three feet wide so it does not result in expansion of the Quigley ditch dimensions.

¶36 Graveley counters that the 1965 Order confined Quigley's secondary easement to the ditch bank and therefore the District Court correctly did so in the case at bar. Graveley further argues that the 1965 Order prohibited Quigley from using maintenance equipment that was more than six feet in width. He maintains that Quigley has traditionally used a backhoe to clean his ditch, so being now restricted to the backhoe should not be a burden. While Graveley's restatement of the 1965 Order is not altogether accurate (the correct

16

statement of the equipment-size limitation is recited in the preceding paragraph), resolution of the issue of the type of allowable equipment and places such equipment may traverse is necessary.

¶37 From our review of the record, it appears that Quigley historically has limited the transportation of his ditch maintenance equipment to his ditch easement as required in the 1965 Order. We believe this is appropriate and should be continued. However, the District Court erred when it limited Quigley to the use of maintenance equipment that is no greater than six feet in width. As equipment technology advances, the size and capability of equipment designed for a certain use changes. While a backhoe may have been or continues to be satisfactory for some ditch maintenance, Quigley is not forever limited to using only a backhoe for ditch maintenance. We conclude Quigley may use equipment specifically designed for ditch cleaning or maintenance, regardless of its footprint size, and may transport and operate that equipment along the upper level edges of the banks of his ditch immediately outside the contours of the ditch, providing that the equipment Quigley chooses to use will not result in expanding the dimensions of the Quigley ditch beyond six feet at the bottom, nine feet at the top and two feet in depth. Moreover, the equipment used shall not damage or negatively impact the property over which it traverses, and if it does, immediate and complete repairs to the damaged property shall be made and the property restored to the condition it was in immediately before Quigley's use, as nearly as possible. Rather than remand for further proceedings when the resolution of this issue can be made on the record before us, we reverse the District Court on this limited issue.

¶38    Additionally, Graveley argues that the District Court was in error when it allowed Quigley, via a "four wheeler," to access his ditch over Graveley's property by any route other than the ditch canal. Graveley complains that Quigley must be confined to the historic use of the ditch bank.

¶39    The District Court defined Quigley's access easement as a "prescriptive" easement. Such an easement is acquired by use, open and notorious, adverse and continuous for a specific period of time. Also, such an easement may not be inconsistent with the owner's rights. "To be 'open and notorious,' the use of a claimed right in a prescriptive easement must give the landowner actual knowledge of the claimed right, or be of such a character as to raise a presumption of notice." *Heller v. Gremaux*, 2002 MT 199, 311 Mont. 178, 53 P.3d 1259 (citation omitted). "To be 'continuous and uninterrupted,' the use of a claimed right must not be abandoned by the user or interrupted by an act of the landowner." *Heller*, ¶ 13 (citation omitted). "To be 'adverse,' the use of the alleged easement must be exercised under a claim of right and not as a mere privilege or license revocable at the pleasure of the landowner, and such claim must be known to and acquiesced in by the landowner." *Heller*, ¶ 13 (citation omitted).

¶40    The court was presented with conflicting testimony regarding how "open" Quigley's use of Graveley's property was where he crossed it to access his ditch for repairs and maintenance. We have held on numerous occasions that when presented with conflicting evidence, the district court is in the best position to make the necessary inferences and determine which evidence is more persuasive. *State v. Couture*, 1998 MT 137, ¶ 17, 289

18

Mont. 215, ¶ 17, 959 P.2d 948, ¶ 17 (citation omitted). In the case at bar, the District Court heard the conflicting testimony, weighed the evidence, and determined that Graveley knew, or should have known, that Quigley was accessing his ditch through various routes across Graveley's property and that such access was not permissive. We conclude that the court was presented with substantial evidence to support the finding that Quigley had a prescriptive easement. Accordingly, we decline to find that the District Court's conclusion of law based on this finding is incorrect.

¶41    *Issue 3*: **Did the District Court err by apportioning equal fault for the damages caused by the landslide to Graveley and Quigley?** In Graveley's cross-appeal, he phrased this issue by questioning whether the District Court erroneously substituted its opinion for that of the experts regarding landslide causation.

¶42    Both parties have denied any responsibility for the landslide damage and have argued that the other party is exclusively responsible. Quigley argued, first, that his ditch was in good general repair and condition and that there was no excess or extraordinary seepage from it during the days leading up to the landslide, and, second, that under § 85-7-2212(2), MCA, if there was seepage, he is not liable for any damage occurring as a result of the seepage. Quigley further argued that Graveley's ditch had large cracks in it allowing for seepage, and that the extensive remodeling of the hillside by Graveley during Graveley's 1993 ditch reconstruction weakened the stability of the hill, removed necessary weight at the base of the hill, and allowed for greater absorption of moisture causing the landslide.

¶43    Graveley countered that Quigley failed to inspect his ditch properly after the 1994 damage to the county road to determine if his ditch needed repairs. He also argued that

19

Quigley ran unprecedented high flows through his ditch for several days before the landslide and therefore had unprecedented seepage rates. He further claimed that Quigley failed to appropriately monitor his ditch during such high flows and that for these reasons, Quigley is exclusively responsible for the landslide.

¶44    The District Court presided over a four-day hearing, reviewed volumes of exhibits, and digested hours of expert testimony, most of it conflicting. In addition to the parties, their sons, and Quigley's repair contractors, the court heard testimony from various paid experts, including an excavating contractor, a State of Montana civil engineer, a geotechnical engineer, an engineering geologist, a water resources engineer, a soil scientist, and an irrigation expert. When all was said and done, the bottom line was that Quigley's experts concluded that the cause of the slide stemmed from Graveley's earth moving and ditch-remodeling activities, and Graveley's experts concluded that the cause of the slide was the weight of Quigley's over-sized berm and seepage from his high flowing ditch.

¶45    We repeat our oft-stated rule that the weight of the evidence and the credibility of witnesses are the domain of the district court. *State v. Jackson,* 2002 MT 212, 311 Mont. 281, 54 P.3d 990 (*citing Couture*, ¶ 17). As noted above, when the evidence conflicts, it is the district court's role to make the necessary inferences and determine which evidence is more persuasive. *See Couture*, ¶ 17. Furthermore, courts are not compelled to adopt the position of one party over the other. *In re Marriage of Hedges*, 2002 MT 204, 311 Mont. 230, 53 P.3d 1273.

¶46    Our review of the voluminous transcript reveals that each of the experts appeared

credible and knowledgeable in his respective discipline and presented informed and plausible explanations for the occurrences of May 23, 1995. Thus, the court heard two credible though contradictory reports blaming each of the parties. Based on this evidence, the District Court's conclusion that the activities of both parties jointly caused the slide and therefore, both parties are equally liable for the costs of the damages, was supported by substantial credible evidence. We will not set it aside.

¶47    *Issue 4*: **Did the District Court erroneously require Quigley to pay some of Graveley's attorney's fees?**

¶48    The case at bar involved two separate Graveley ditches. One Graveley ditch was located just below the Quigley ditch in the landslide area and was damaged during the landslide. The other Graveley ditch is located to the west of the landslide site and was not part of the landslide. The District Court found that when Quigley conducted landslide repairs, he purposely filled in approximately 1300 feet of the Graveley ditch to the west of the landslide site. Under § 70-17-112, MCA, the court granted attorney's fees to Graveley for the costs associated with respect to this ditch.

¶49    Section 70-17-112, MCA, prohibits the interference with canal or ditch easements and specifically states, "If a legal action is brought to enforce the provisions of this section, the prevailing party is entitled to costs and reasonable attorney's fees." Section 70-17-112(5), MCA. Quigley argues that because Graveley did not prevail on every issue of this suit, he is not entitled to attorney's fees under this provision. Graveley counters that the action against Quigley for filling in his ditch was an action independent from his claims relating to

21

the landslide and since he prevailed on this issue, he is entitled to attorney's fees. This Court held in *Engel,* ¶ 40, that "[i]n order to be deemed a 'prevailing party' for the purposes of Section 70-17-112(5), MCA, . . . a party must successfully prevail on *all* claims raised pursuant to this statute." (Emphasis in original). Graveley's encroachment claim is the only claim he brought pursuant to this statute. He prevailed on that claim. The District Court therefore correctly granted him attorney's fees. We affirm the District Court on this issue.

¶50 *Issue 5*: **Did the District Court err in refusing to grant Quigley a new trial on the injunction temporarily limiting Quigley's ditch flow to 400 miner's inches?**

¶51 In order to assess whether the District Court erred in denying Quigley a new trial, we review the District Court Findings that prompted Quigley's motion for a new trial.

¶52 After the landslide, Quigley had various experts and advisors suggest repair methods and steps that could be taken to minimize future problems with his ditch and the hillside on which it was located. One consistent recommendation was that he install a ditch liner that would prevent seepage from his ditch into the hillside. Quigley accepted this recommendation and had the liner installed. After installation, however, Quigley experienced consistent trouble keeping the liner covered with native soils or rocks. This was because the native soils and small rocks put on top of the liner were washed away by the velocity of high volumes of water running through the ditch. Quigley testified that he eventually hand-placed enough large rocks to keep the liner in place and covered. Graveley, however, argued that he had concerns about the continued exposure of the liner as well as complaints that the repairs to the hillside were not adequately performed. Contending

22

Quigley failed to appropriately compact the soils during repair, Graveley asserts that the hillside remains unstable and subject to future failure as a result of moisture from rainfall, groundwater and any ditch seepage.

¶53    As for the exposed liner, there was considerable testimony during the four-day trial that an exposed liner was subject to premature deterioration and damage. One witness, however, testified that in Montana climes an exposed liner is not as vulnerable as an exposed liner under the harsh sun and weather in the southwest, where apparently exposed liner testing was conducted. Additionally, there was testimony that an uncovered liner could allow water to seep underneath it, which could eventually wash the liner down the ditch, causing it to create a dam and a ditch overflow.

¶54    The District Court concluded that both parties had breached their duty of care-- Quigley had breached his duty of care by significantly increasing his ditch flows in spite of knowing that his ditch was experiencing significant seepage and by failing to adequately inspect it; Gravely had breached his duty of care by recontouring and significantly changing the slope below the Quigley ditch and by creating a new ditch that disturbed natural soils which allowed increased saturation and destabilization. As a result of Quigley's negligent operation of his ditch and the evidence presented of the risks associated with a high volume of flow in Quigley's ditch, the District Court in its May 2000 Order limited Quigley to a flow of no more than 400 miner's inches until such time as Quigley could prove to the court that his ditch can safely transport more than that volume. In December 2000, Quigley filed a motion for a new trial in order to have this injunction lifted. The District Court did not issue

23

a ruling on the motion and under Rule 59(d), the motion therefore was deemed denied.  Rule 59(d)M.R.Civ.P.

¶55    Section 25-11-102, MCA, sets forth the grounds for a new trial.  The applicable subsection to the case before us is § 25-11-102(4), MCA, which requires that the party moving for a new trial must present "newly discovered evidence material . . . which he could not, with reasonable diligence, have discovered and produced at the trial."  A party moving for a new trial on the basis of newly discovered evidence must show that: (1) this evidence came to the party's knowledge since the trial; (2) it was not through want of diligence that the evidence was not discovered earlier; (3) the evidence is so material that it would probably produce a different result upon retrial; (4) the evidence is not merely cumulative; and (5) the evidence does not tend only to impeach the character or credit of a witness.  *Groves v. Clark*, 1999 MT 117, 294 Mont. 417, 982 P.2d 446 (citation omitted).

¶56    In the case before us, in accordance with § 25-11-104(1)(b), MCA,  Quigley submitted an affidavit declaring to the District Court that he had flowed in excess of 400 miner's inches through his ditch, without problems,  throughout the 1999 irrigation season between the final day of the trial and the court's issuance of its May 2000 Order.  Quigley asserted in his affidavit in support of his motion for a new trial that he had closely monitored his ditch since the landslide repairs were completed and that his ditch liner has remained covered and in place.  Quigley also submitted a supporting affidavit of Dr. Westesen, an expert who testified on Quigley's behalf during the trial.  Dr. Westesen declared that he had visited the Quigley ditch in September 2000 and found the "ditch to be stable and in good

24

condition." He further testified that the liner remained covered and stable and that there was no vegetative evidence or moist soil down slope of the Quigley ditch.

¶57 Graveley argues that the evidence Quigley presented in his motion for a new trial had been presented to the District Court at the trial and therefore Quigley has not presented the requisite "newly discovered evidence." Furthermore, Graveley asserts that, with the exception of the ditch liner, Quigley has not addressed the other concerns presented by experts that render a high-volume Quigley ditch a potential threat for a future landslide. Quigley maintains that the "new evidence" stemming from his successful operation of his ditch since the trial could not have been presented earlier.

¶58 We conclude that the District Court did not abuse its discretion by denying Quigley's motion for a new trial. Although Quigley sought to present evidence of what has occurred since the trial, the fact remains--as the court noted--that varying flows when combined with other varying conditions, can still produce damaging results. Thus, the fact that the ditch conveyed water without problems between 1999 and May of 2000 is not so compelling or determinative as to override all of the historical evidence presented at trial. Accordingly, we conclude that the evidence presented by Quigley in his affidavits in support of his motion for a new trial, while new, is not sufficient to justify an order for a new trial. We therefore affirm.

¶59 *Issue 6*: **Did the District Court err by granting Graveley excessive and speculative damages which improved Graveley's position?**

¶60 As we have recited numerous times in this Opinion, the District Court is in the best

25

position to weigh the evidence and assess the credibility of the witnesses. Our review of the record reveals nothing that leads us to conclude that the District Court abused its discretion when determining the amount of damages suffered by both parties in this case. As a result, we cannot conclude the District Court's award of damages was excessive. We therefore affirm.

## CONCLUSION

¶61 For the reasons stated in this Opinion, we reverse in part and affirm in part.


/S/ PATRICIA COTTER

We Concur:


/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM REGNIER

/S/ DEBORAH KIM CHRISTOPHER
District Judge Deborah K. Christopher
sitting for Justice Jim Rice


/S/ KATHERINE R. CURTIS
District Judge Katherine R. Curtis
sitting for Justice W. William Leaphart

26

Justice Terry N. Trieweiler concurring and dissenting.

¶62   I concur with the majority's resolution of issues two through six.   I dissent from the majority's conclusion under issue one that the Defendant James C. Quigley's irrigation ditch easement is limited to a conveyance 800 miner's inches.

¶63   Although various district court proceedings are discussed in the majority Opinion, only one proceeding, Powell County District Court Number 4234, actually decided ownership of Ophir Ditch and decreed the amount of flow that should be permitted through that ditch.  That decree which was entered on March 24, 1962, stated:

> Now, therefore, it is ORDERED ADJUDGED AND DECREED that the defendants, Clifford Quigley and Esther Quigley, are the owners of the ditch variously referred to as the Ophir Ditch, Ophir-Quigley Ditch, Quigley Ditch and China Ditch, and have the right to flow 925 inches of the waters of Ophir Creek in and through said ditch; . . . .  [Emphasis added.]

¶64   That decree was affirmed by this Court in *Graveley v. Quigley* (1963), 142 Mont. 596, 386 P.2d 60.  Clifford Graveley did not appeal the district court's conclusion that Quigleys were entitled to flow 925 miner's inches of water from Ophir Creek through the Ophir Ditch and is, therefore, bound by principles of res judicata to that finding and conclusion.  Instead of applying this simple principle based on the previous decree's plain language, the majority re-try the entire issue on appeal to arrive at a contrary result.

¶65   It is true that in the legal description incorporated in the 1962 decree, there is a reference to a "carrying capacity of 800 miner's inches" in the same ditch.  However, it is apparent from the findings and conclusions that the district court did not intend to be bound by that limitation found in the legal description.  In its Finding of Fact No. 3 entered in the same action on February 21, 1962, the district court made the following statement immediately after setting forth the same legal description:

27

[A]ny differences between the description just given of said ditch and the various type written descriptions appearing in said Cause Number 2038, . . . are mere clerical and stenographical errors that the plat or map filed with the petition of plaintiff and petitioner, John R. Quigley, at the commencement of Cause Number 2038 and prepared by E. J. Strasburger, a competent engineer and witness in cause number 2038 as well as in this action, which plat or map was plaintiff's exhibit two in Cause Number 2038 and defendant's AA in this action was and is a correct survey and description of said ditch and area in controversy, is referred to and forms a part of the decrees and judgments in Cause Number 2038, and controls all descriptions of said ditch in Cause Number 2038 and this action.

¶66 In other words, while the district court in 1962 used the legal description relied on by the majority at various points in its findings, conclusions or decree, it made clear that to the extent that legal description was inconsistent with E. J. Strasburger's map which was offered as an exhibit in that case, Strasburger's map controlled. That map is also an exhibit in this case and its meaning is not self-evident. However, apparently Strasburger testified in Cause Number 4234 and his testimony and exhibit formed the basis for the District Court's conclusion of law and decree that Quigleys were entitled to flow 925 miner's inches through Ophir Ditch. As an example, the district court's Conclusion of Law I, entered on February 21, 1962, also clearly states as follows:

That the defendants, Clifford Quigley and Esther Quigley, are the owners of the ditch variously referred to as the Ophir Ditch, Ophir-Quigley Ditch, Quigley Ditch and China Ditch, and described more particularly in the court's Finding Number 3, and have the right to flow 925 inches of the waters of Ophir Creek in and through said ditch.

¶67 The district court's inclusion of the legal description of the ditch in Finding No. 3 is inconsistent with the district court's conclusion and decree. However, the district court explained that it did not intend to be bound by that legal description where it was inconsistent with other more accurate evidence. There is nothing unclear, however, regarding the district court's conclusion of law or the district court's decree. Quigleys were given the right to flow 925 miner's inches through Ophir Ditch. The Supreme Court affirmed that decree and Graveley is now bound by that decree,

28

notwithstanding the majority's selective reliance on evidence which would have supported a contrary result.

¶68    The majority Opinion in ¶ 9 states that the district court found in 1962 that Quigley's ditch had a carrying capacity of 800 miner's inches.  That is not correct.  The only reference to 800 miner's inches is included in the legal description of the ditch included in the district court's findings by which the district court specifically stated it did not intend to be bound.

¶69    The majority Opinion makes repeated reference to the district court's interlocutory 1965 order which established a capacity for Quigley's ditch of 800 miner's inches.  However, as the District Court in this case correctly noted, no final order was entered in Cause No. 4311 and the interlocutory order is not legally binding on either party.  That conclusion has not been appealed by Graveley.

¶70    The majority Opinion states in  ¶ 26 that the district court in its 1930 Opinion limited Quigley's right of conveyance through his ditch to 800 miner's inches.  However, the 1930 Opinion did not adjudicate Quigley's right to use of his ditch.  It merely consists of the amended findings of fact and conclusions of law made by the district court following remand by this Court in *Quigley v. McIntosh* (1930), 88 Mont. 103, 290 P. 266.  The only thing adjudicated in that case was the amount of water Quigley was entitled to appropriate from Ophir Creek.  The amount of water Quigley was entitled to transfer through his ditch was not at issue and the reference relied on by the majority is, therefore, irrelevant dicta.

¶71    Finally, in ¶ 29, the majority erroneously states that language describing Quigley's ditch as having a carrying capacity of 800 miner's inches has been used in proceedings between the parties, without objection by Quigley, since 1928.  As previously pointed out, the only decree directly on point provided a right to convey 925 inches.  Why would Quigley challenge it?

29

¶72    For these reasons, I conclude that the District Court erred when it limited Quigley's historic right to convey water through his ditch to 800 miner's inches.  I would reverse that part of the District Court's judgment and dissent from the majority's conclusion to the contrary.

/S/ TERRY N. TRIEWEILER