FILED

09/30/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0576

DA 24-0576

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2025 MT 219

FRANK A. APECELLA and
SHIRLYNNE APECELLA,

      Plaintiffs and Appellees,

  v.

LILLIAN A. OVERMAN and
LARRY ROBINSON,

      Defendants and Appellants.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DV-21-240
Honorable Howard F. Recht, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Rick C. Tappan, Connlan W. Whyte, Tappan Law Firm, PLLC, Helena,
Montana

            Dale Schowengerdt, Landmark Law, PLLC, Helena, Montana

      For Appellees:

            David B. Cotner, Taylor N. Eisenzimer, Cotner Ryan Blackford, PLLC,
Missoula, Montana

Submitted on Briefs:  July 30, 2025

Decided:   September 30, 2025

Filed:

_____
Clerk

Justice Katherine Bidegaray delivered the Opinion of the Court.

¶1      Lillian Overman and Larry Robinson (collectively, Overman) appeal separate March and May 2024 Orders from the Montana Twenty-First Judicial District Court, Ravalli County, granting Frank and Shirlynne Apecella (collectively, Apecellas) declaratory judgment that they have an irrigation ditch easement through Overman's property for delivery of their water right and Overman interfered with their easement by filling in the ditch, and awarding Apecellas attorney fees.  We address the following restated issues:

1. *Did the District Court erroneously conclude that Overman failed to prove abandonment or reverse adverse possession of Apecellas' irrigation ditch easement?*

2. *Did the District Court erroneously award Apecellas attorney fees as the prevailing party on their statutory ditch interference claim under § 70-17-112, MCA?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      In late December 2020, Apecellas bought a house and property in Hamilton, Montana (the Apecella Property).  Overman is their neighbor adjacent to the entire western boundary of the Apecella Property, and the properties are separated by a two-foot-high rock wall.  Overman purchased her property in June 2002 (the Overman Property); her husband, Robinson, lives there with her.

¶3      The historic Decker Ditch originates at Roaring Lion Creek and conveys water approximately one mile across adjacent properties and to the western boundary of the Overman Property.  Within the Overman Property, the open ditch runs due east and then

2

splits at a "bifurcation point." At this point, the ditch runs due north to the northern boundary of the Overman Property and crosses it to deliver water to northern neighbors. The ditch also continues from the bifurcation point due east across the Overman Property before entering the rock wall dividing the Overman and Apecella properties through a metal pipe. On the other side of the rock wall, the pipe spills through a screen into a buried pipe that runs slightly southeast a short distance through the Apecella Property to where it converges with another ditch, the Spring Ditch. The Spring Ditch originates at a natural spring in the southwest corner of the Apecella Property, runs north to the convergence with the Decker Ditch, and then turns east across the property. The portion of the ditch running east from the bifurcation point on the Overman Property to the rock wall on the Overman/Apecella boundary is the "Ditch in Question" in these proceedings.

¶4 Apecellas own an irrigation water right in Roaring Lion Creek, with the point of diversion at the headgate for the Decker Ditch.[1] The first spring after they moved in, Apecellas were not receiving any water through the Ditch in Question and hired a consultant, Tracey Turek, to investigate their water right. Turek did a site inspection of the Apecella and Overman properties in early May 2021 and determined that Apecellas had a

---

[1] Apecellas co-own an irrigation water right (76H 2506 00) with other lot owners in the 36-acre Roaring Lion Estates subdivision. The co-owned water right is for a maximum of 404 GPM for a period of use from April 1 through October 4. Apecellas own subdivision Lots 1 and 2. The 2009 recorded subdivision plat allocates Lot 1 74 GPM and Lot 2 53 GPM (127 GPM total) of this 404 GPM water right. Overman's water right (76H 43178-00) is for 55 GPM of Roaring Lion Creek water, also delivered through the Decker Ditch and for a period of use from April 1 through October 4. The Apecella and Overman water rights are of equal priority, established May 1, 1897, and are not disputed here. This Court has long recognized that "ditch easements and water rights represent separate and distinct property rights." *Roland v. Davis*, 2013 MT 148, ¶ 24, 370 Mont. 327, 302 P.3d 91.

3

water right on the Decker Ditch. Shortly after, Apecellas approached Robinson asking for their water. Robinson diverted water through the Ditch in Question into the Apecella Property. The water flowed freely until the ditch became clogged with lawn debris in late May 2021. The parties removed the clog together. Two days later, however, Robinson filled in the ditch with dirt, cutting off all water flow to the Apecella Property, and installed a "no trespassing" sign. When confronted, Robinson told Frank Apecella to "have your people call my people."

¶5      In late June 2021, Apecellas initiated a district court action seeking a declaratory judgment affirming their ditch easement right and secondary right to enter, inspect, repair, and maintain the ditch, and alleging that Overman interfered with their ditch easement in violation of § 70-17-112, MCA. They sought injunctive relief enjoining Overman from further interference with their ditch. In their complaint, Apecellas also separately alleged claims for "intentional interference with property rights" and "nuisance." Overman admitted the Decker Ditch ran though her property but denied it extended to and served the Apecella Property. Overman later amended her answer to assert extinguishment of any ditch easement by abandonment and reverse adverse possession.[2]

¶6      The District Court held a three-day bench trial in July 2023. We summarize the pertinent trial testimony and exhibits as follows:

---

[2] In her answer and at trial, Overman used the phrase "reverse prescription," but abandoned it on appeal in favor of the phrase "reverse adverse possession."

4

### 1. Evidence of An Implied Irrigation Ditch Easement at the Time of Severance of the Boldt Family Homestead in 1966.

¶7 From 1943 to 1966, Ted Boldt Sr. and Felsie Decker Boldt owned approximately 600 acres of land encompassing what are now the Apecella Property and the Overman Property. Beginning in 1966, they sold all the property but a 36-Acre Remainder containing the original homestead, part of which later became the Apecella Property. On May 30, 1986, they conveyed the 36-Acre Remainder to their son and daughter-in-law, Ted and Patty Boldt, who owned it for 19 years, until 2005. In 2005, Ted Jr. and Patty Boldt conveyed the 36-Acre Remainder to Wayne and Cindy Anderson, who, in 2009, subdivided it into four lots and, in 2010, sold Lots 1 and 2 to Richard Kelm. In 2020, Kelm sold Lots 1 and 2 to Apecellas.

¶8 The Overman Property was separated from the 600 acres in 1966 when Ted Sr. and Felsie Boldt retained the 36-Acre Remainder and sold the rest, which included what became Tract F, part of which became the Overman Property. The chain of title to the Overman Property and testimony reveals that Cliff and Anita Belew resided on Tract F beginning in 1979 and subdivided it in 1998 into Tract I and Tract II. Belews continued to live on Tract I and, in 1998, conveyed Tract II to their son, Charles, who, in 1999, conveyed it to Joseph and Amber Williams. In 2002, the Williams conveyed Tract II to Overman.

¶9 Ted Boldt Jr. testified the Decker Ditch conveyed Roaring Lion Creek water to their property through the Overman property the entire time he and Patty owned it—1986 to 2005. His family established the 1897 Roaring Lion Creek irrigation water right that is Apecellas' water right today, and his grandfather dug the Decker Ditch by hand. Ted Jr.

5

maintained the ditch all the way to the headgate on Roaring Lion Creek every year. Patty Boldt testified the water "always came in" through that ditch and had done so since the 1800's. The Boldts said that, when they sold the 36-Acre Remainder to Wayne Anderson in 2005, the Decker Ditch was intact and delivering Roaring Lion Creek water across the Overman Property to theirs. Cliff Belew testified that the Decker Ditch delivered water through his property (Tract F) and into the Apecella Property when he moved there and continued to do so at the time of the 1998 subdivide.

¶10     Apecellas' expert witness Turek, and Overman's expert witness Lee Yelin, both agreed that, historically, multiple west-east laterals of the Decker Ditch served the 600-acre Boldt homestead, any one of which could deliver all the Boldts' 404 GPM water right. Turek opined that, based on her review of aerial photos and historical records, since 1966, the Decker Ditch lateral traversing the Overman Property was the only means of delivering Roaring Lion Creek water to the 36-Acre Remainder created upon severance of the Boldt homestead ranch. Turek denied that any Roaring Lion Creek water came through the southern boundary of the Apecella Property or flowed in the Spring Ditch prior to convergence with the Decker Ditch. Overman's expert Yelin testified only that the Ditch in Question had not delivered any Roaring Lion Creek water right across Overman's eastern property boundary since 2002, when Overman acquired the property, and did not expressly dispute that the 1966 severance of the Boldt homestead created a ditch easement.

## 2. Evidence of a Prescriptive Ditch Easement from Boldts' Ownership to Apecellas' Ownership (1966-2020).

¶11    Ted Jr. and Patty Boldt testified that the Decker Ditch delivered their Roaring Lion Creek water right across the Overman Property from 1986 to 2005. Cliff Belew testified that, from 1979 to 1998, when he lived next door to the Boldts, the Decker Ditch delivered water to the Boldts through his property when it was available in the spring and summer months. Belew illustrated the ditch crossing his eastern property boundary into Boldts' property on his 1998 subdivision plat, and Turek testified Belew's depictions matched ditch locations during her May 2021 site inspection of the Overman and Apecella properties. Belew also testified that Overman and Robinson visited him before his 2022 deposition and "tried to change [his] mind about where [the] water went" but he refused.[3]

¶12    Other witnesses testified regarding use of the Decker Ditch. Darrell Lee, a neighbor to the south and east of the Overman and Apecella properties, was a friend of the Boldts and visited them often. He considered buying their 36 acres in 2004 to expand his 1000-acre cattle ranch. In 2004, when on Boldts' property, Lee observed an intact, open ditch running across the Overman Property and delivering water to Boldts' property. However, he said that, at the time, Ted Boldt Jr. was not "aggressively" irrigating the property because he was trying to "dry it out" to get perc tests for a septic system. Lee could not recall seeing the ditch when he visited the property later during Rick Kelm's ownership.

---

[3] Robinson denied trying to influence Belew's testimony.

¶13    Clint Brown was a hydrologist and friend of Overman's who visited her property often from 2003 to 2010, during Boldts' pre-2005 and then Anderson's post-2005 ownership. Brown also consulted for Overman when she adjudicated her Roaring Lion Creek water right in 2006. Documents from that adjudication identified ditch locations on the Overman Property, including a "ditch at east boundary" with a GPS location just east of the property line on Apecellas' side. While on the Overman Property, Brown observed the Decker Ditch carrying water downgradient toward the fence line on the eastern property boundary. He also observed the eastern neighbor flood irrigating with large orange tarps along the ditch at several locations in his yard, though he did not say what year. Sometime between 2005 and 2007, the eastern neighbor asked Robinson to shut off the flow "temporarily" so that he could do perc testing for installing a septic system.

¶14    Wayne Anderson purchased the Boldts' 36-acre parcel in 2005 and, after subdividing the property into four lots in 2009, sold Lots 1 and 2 to Rick Kelm in 2010. Kelm lived there until 2020, when he sold the two lots to Apecellas. Kelm testified that, when he moved onto Lots 1 and 2, Anderson pointed out the hundred-year-old "homesteaders" ditch in the direction of the Overman Property where a rock wall and pipe were located. Kelm installed the underground pipe from the rock wall to the Spring Ditch convergence. Water ran regularly through the Decker Ditch for the first three years he was there, and he used it to irrigate both lots as pasture for his horses and cattle.

¶15     Kelm said that, beginning in 2013, water flowing from the Decker Ditch "slowed . . . down considerably."[4]  Kelm described it as a "trickle at times," and "a little more other times," but nevertheless, there was "always water coming through" the pipe every summer of every year he lived there.  When Robinson removed the pipe in the rock wall in 2013, Kelm replaced it with a new pipe "to try to get [his] water back" and hired an attorney, who delivered a demand letter to Overman.  A year later, he tried to hire another attorney but was ultimately unable to afford representation.[5]

¶16     In spring 2021, after purchasing Lots 1 and 2 from Kelm the year before, the Apecellas noticed that no water was coming from the Decker Ditch, as Kelm told them it would.  They hired Turek to investigate their water right.  Turek testified that, during her May 2021 site inspection, she saw a "very evident" irrigation ditch on Overman's side of the rock wall and there was "no question" it continued through the pipe into the Apecella Property.  Following Turek's inspection, Apecellas approached Robinson about receiving their water right.  Robinson opened the Decker Ditch at the bifurcation point and, within 15 minutes, water began "flow[ing] nicely" through the rock wall pipe into the underground pipe and then into the Spring Ditch.  Frank Apecella estimated it flowed for a couple weeks until the ditch became clogged, when he and his son helped Robinson clear the blockage.  After that, the water flowed again.  However, on May 29, 2021, Frank

---

[4] Kelm suspected that Overman and Robinson were restricting the flow to strongarm him into doing work for them on their property, and that Robinson and northern neighbor Jeff Burrows were in "cahoots" to divert more water north to Burrow's property.

[5] Kelm was living off social security and suffered numerous health problems, including a heart attack leading to open-heart surgery in 2017.

realized water was no longer coming from the Overman Property. Upon inspection, Frank discovered Robinson had filled in the ditch on the other side of the rock wall with dirt and installed a "no trespassing" sign. Apecellas initiated the instant case a month later.

¶17 Apecellas' expert, Turek, testified that, since creation in 1966, the Decker Ditch easement was in continuous use until Overman and Robinson interfered in 2021 by filling in the Ditch in Question. She based her opinion on review and analysis of dozens of aerial photos showing irrigation patterns she believed indicated regular use of Roaring Lion Creek water from the Decker Ditch. Turek thought that, historically, the multiple ditch laterals could convey all of the 404 GPM water right, but she did not think the ditch as it existed on the Overman Property could carry that volume.[6] She explained that the water right was measured at the ditch head gate, over a mile away, and there could be water loss of 50% in that distance. Nevertheless, she thought Apecellas were entitled to all their water right, which would require reconstruction of the ditch to increase capacity.

### 3. Evidence of Extinguishment of Apecellas' Decker Ditch Easement.

¶18 Conversely, some witness testimony and evidence contradicted Apecellas' claim of use. Jeff Burrows is Overman's and Apecellas' neighbor to the north, and he receives water from the Decker Ditch after it crosses Overman's northern property boundary. Since 2010, Burrows has regularly maintained the ditch to its headgate on Roaring Lion Creek

---

[6] Turek did not measure the flow at any location. However, Clint Brown, Overman's hydrologist friend, estimated that the ditch through the Overman Property could carry as much as 120 GPM. Robinson testified that, when he diverted water through the ditch to Kelm in 2013 and Apecellas in 2021, he estimated the flow rates at between 20-30 GPM.

and opens and closes the headgate annually.[7] Burrows testified that Anderson, Kelm, and Apecellas never received water from the Ditch in Question, which he said was only a "swale" past the bifurcation point that Overman occasionally used to water her trees. Burrows admitted, however, that Kelm did receive some water from the Overman Property, but assumed it was only wastewater (run-off) from the swale irrigation. Burrows admitted that, when Apecellas approached him in spring of 2021 asking about their water right, he told them "water will be here in a little while," but later, he denied telling them "water will be on and we'll get you some water."

¶19 Wayne Anderson, who purchased Boldts' 36-acre parcel in 2005, testified that he walked the property with Ted Boldt Jr., who told him the water in the Spring Ditch came "out of the side of the hill." He acknowledged that a ditch existed on the Overman Property, but said it turned north and did not deliver water to his property. Instead, it was "obvious" his water came from the Spring Ditch.[8] Anderson did not move onto the property until 2008; meanwhile, he leased to tenants who he said never took care of the yard or pastures. While cleaning the property in 2007, Anderson stacked rocks on the

---

[7] Burrows admitted he never measures how much water he diverts into the Decker Ditch at its headgate. He also believed the Decker Ditch lacked the capacity to satisfy all water rights at the same time.

[8] Anderson had his own theory about where his Roaring Lion Creek water right came from. His mother, Luella Boom, owned the property immediately to the south of the Overman and Apecella Properties. A ditch runs west-to-east across Boom's property that Anderson believed somehow tied into the Spring Ditch, but he did not know if it was "ditch into ditch or ditch into bog and then back into ditch" because it was "just a mess" near the southern property boundary. Overman's expert Yelin had the same theory, i.e., that a southern lateral through Boom's property conveyed Apecellas' water right, not Overman's ditch, but it was no longer connected to the Apecella Property due to lack of maintenance.

western boundary to create the rock wall, though he denied installing a pipe. Conversely, Rick Kelm testified the pipe was there when he bought the property from Anderson in 2010 and Robinson testified he installed the pipe in 2013.[9]

¶20   In preparing to subdivide, Anderson tried to "dry out" the property by installing a pipe in the open portion of the Spring Ditch as it ran east through the property. Jeff Burrows and Darrel Lee confirmed that Anderson was drying out the property for groundwater monitoring/perc tests to install septic systems in advance of the subdivide. In 2009, Anderson subdivided the 36 acres, creating the four-lot Roaring Lion Estates. In the 2009 subdivision plat's "irrigation plan," Anderson allocated a total of 404 GPM of water (the original water right for the 36-Acre Remainder) between the four lots, including a total of 127 GPM to Lots 1 and 2.[10] The 2009 plat shows only the Spring Ditch, originating in the southwest corner of Lot 1, but does not show the Decker Ditch to the west or its convergence with the Spring Ditch. However, the plat separately describes the irrigation system as follows:

> Water is diverted from Roaring Lion Creek into *an unnamed ditch which enters Lot 1 from the west*. Water is then transported into an existing irrigation culvert until it reenters an irrigation ditch which then exits the property to the east.

---

[9] There was conflicting testimony about Robinson's installation of the rock wall pipe. Overman testified at deposition that Robinson installed it in 2007. Overman's expert Yelin's report identified the pipe in a photo as installed in 2007. When asked about the discrepancy, Robinson answered, "we all get confused with dates."

[10] *See*, *supra* note 1.

(Emphasis added.) Anderson believed the Spring Ditch was the ditch identified as coming "from the west." Apecellas' expert Turek discounted the 2009 plat ditch depiction because it contradicted the written description and other evidence. She also believed aerial photos during Anderson's ownership period showed irrigation patterns that contradicted Anderson's claim he never received water from the Decker Ditch.

¶21    Overman did not testify at trial, but her husband did. Robinson described the Decker Ditch as entering his property from the west, running east to the bifurcation point, and turning north there. When he moved there in 2002, the ditch did not continue east because, past the bifurcation point, "the culvert had been crushed" and was "overgrown" and "backfilled with dirt." He denied the Decker Ditch ever extended to the eastern boundary or into the Apecella Property. Instead, he called the ditch past the bifurcation point his "private lateral," which continued for a short distance until transitioning into a swale that sloped down to a "low depression" just west of the rock wall. Robinson occasionally diverted water down the swale to a grove of trees there. He was unaware of Apecellas' or Boldts' water rights on the Decker Ditch and believed the Apecella Property "needed to be fed" from a southern lateral, not his private ditch.

¶22    Robinson testified that the only time Kelm and Apecellas received any Roaring Lion Creek water through the ditch was when he gave them each water in 2013 and 2021, respectively. He said there was never a pipe in the rock wall until he installed one in 2013, when Kelm asked for water and the water Robinson sent down the swale began pooling

13

against the wall. Robinson removed the pipe, however, after Kelm "altered the ditch" while he was away.[11] He said he only ever sent Kelm water for a few days.

¶23 Robinson also gave Apecellas the "same consideration" and sent water when they asked in May 2021. He admitted it flowed through the pipe to the Apecella Property but denied it flowed for weeks. Robinson also admitted that, when the ditch became clogged, Frank Apecella and his son came to help clear the obstruction. Shortly after, Robinson was mowing the area near the swale and noticed that "somebody had been down there picking out a little ditch in the depression" which caused his mower to get stuck in the mud. He said that "really irritated [him] and that's when [he] filled in the depression" with his tractor.

¶24 Overman's expert Yelin testified that, while the Decker Ditch did enter and traverse the Overman Property, it turned north at the bifurcation point. Past that, the ditch to the east was only a "field ditch" and Overman's "private lateral." Yelin opined that a different Decker Ditch lateral served the Apecella Property, traversing the property of their southern neighbor and feeding the Spring Ditch.[12] He believed that the only time water flowed through the Ditch in Question since 2002 was when Overman diverted it to Kelm and Apecellas. Aerial photos showed that most of the Apecella Property had not been irrigated

---

[11] Robinson testified that, in 2013, someone entered his property and smashed the wooden corner box at the bifurcation point. He suspected it was Kelm. After, Robinson installed the turn valve that exists there today. Kelm testified that, after Robinson removed the pipe, he immediately installed a new pipe in the rock wall.

[12] Though Yelin conceded this "southern lateral" through Luella Boom's property was "not directly connected anymore to the Decker Ditch" and "does not currently connect" to the Apecella Property. Yelin credited this, however, to the ditch not being maintained for the last 30 years. *See*, *supra*, note 8.

"for decades" and, from 2005 on, lawn and garden irrigation was "mostly from well and spring water" or water pumped from the Decker Ditch where it ran north of the Apecella Property.

¶25 In March 2024, the District Court found and concluded that: (1) Apecellas established by clear and convincing evidence an implied easement and a prescriptive easement for the Ditch in Question on the Overman Property for delivery of their Roaring Lion Creek water right, which Overman interfered with under § 70-17-112, MCA, by filling in the ditch; and (2) Apecellas had a secondary right to enter, inspect, repair, and maintain the ditch, which Overman encroached upon by installing a "no trespassing" sign. The court also concluded that Overman failed to prove her claims of extinguishment by abandonment or reverse adverse possession and permanently enjoined Overman from any further interference with Apecellas' irrigation ditch easement. Finally in May 2024, the District Court concluded that Apecellas were the prevailing party under § 70-17-112(5), MCA, and later awarded Apecellas $189,935.32 in costs and attorney fees.[13] Overman timely appeals.

## STANDARD OF REVIEW

¶26 In reviewing a district court's declaratory judgment on an easement, we review the court's findings of fact for clear error. *Musselshell Ditch Co. v. JD Bar D, LLC*, 2025 MT 63, ¶ 8, 421 Mont. 232, 566 P.3d 511. A finding of fact is clearly erroneous if not supported by substantial evidence, if the court misapprehended the effect of the evidence, or we are

---

[13] Overman did not dispute the reasonableness of Apecellas' costs and fees requests.

15

convinced on review that a mistake was made. *Engel v. Gampp*, 2000 MT 17, ¶ 31, 298 Mont. 116, 993 P.2d 701. When assessing whether substantial evidence supports a factual finding, we view the evidence in a light most favorable to the prevailing party. *Engel*, ¶ 31. We review a district court's conclusions of law, including its interpretation and application of statutes, de novo for correctness. *Musselshell Ditch*, ¶ 8.

¶27 To extinguish an existing ditch easement by "reverse adverse possession," the servient owner bears the burden to prove by clear and convincing evidence each element—open, notorious, exclusive, adverse, continuous, and uninterrupted use—for five successive years. *Brimstone Mining, Inc. v. Glaus*, 2003 MT 236, ¶ 37, 317 Mont. 236, 77 P.3d 175. Proof of "adverse" conduct alone does not satisfy the other elements. *Warnack v. Coneen Family Tr.*, 266 Mont. 203, 216-17, 879 P.2d 715, 723-24 (1994). A claim of abandonment likewise requires clear and convincing proof of both nonuse and acts "of a character so decisive and conclusive as to indicate a clear intent to abandon the easement." *Rieman v. Anderson*, 282 Mont. 139, 145-46, 935 P.2d 1122, 1126 (1997) (citation omitted); *Shammel v. Vogl*, 144 Mont. 354, 361-62, 396 P.2d 103, 107-08 (1964).

¶28 Whether a party is entitled to recover attorney fees is a question of law reviewed de novo for correctness. *Chase v. Bearpaw Ranch Ass'n*, 2006 MT 67, ¶ 14, 331 Mont. 421, 133 P.3d 190; *Engel*, ¶ 32 ("[i]f a district court concludes that one party has prevailed and is entitled to attorney's fees, we review that conclusion to determine if it is correct"). Where legal authority exists to award attorney fees, we review the attorney fee award for an abuse of discretion. *Chase*, ¶ 15; *Ray v. Nansel*, 2002 MT 191, ¶¶ 40-47, 311 Mont. 135, 53 P.3d 870.

**DISCUSSION**

¶29  *1. Did the District Court erroneously conclude that Overman failed to prove abandonment or reverse adverse possession of Apecellas' irrigation ditch easement?*

¶30  On appeal, Overman denies that she failed to prove extinguishment by abandonment or reverse adverse possession, arguing that the District Court ignored substantial evidence she adversely possessed Apecellas' ditch easement and that the Boldts, Anderson, and Kelm each intentionally abandoned the easement. Notably, Overman does not contend that Apecellas failed to establish an implied or prescriptive easement; instead, her claim of extinguishment presupposes the existence of an easement in the first place. As such, Overman argues only that Apecellas "failed to establish a ditch easement over Overmans' property *was not adversely possessed or abandoned*." (Emphasis added.)

**A. Creation and Extinguishment of Implied Easements by Prior Use and Prescriptive Easements.**

¶31  An easement is a non-possessory interest in property owned by another for a specific purpose or a servitude imposed as a burden upon land. *Park Cnty. Rod & Gun Club v. Dep't of Hwys.*, 163 Mont. 372, 376, 517 P.2d 352, 355 (1973). As pertinent here, an easement may be created by implication from a prior existing use and by prescription, each requiring distinct elements of proof. *Musselshell Ditch*, ¶ 10. An implied easement by preexisting use arises when, at the time of severance of two parcels originally in common ownership, an apparent and continuous use exists on the servient part that is reasonably necessary for the enjoyment of the dominant part, and the parties intended the use to continue after severance. *Thomas Mann Post No. 81 v. Knudsen Family L.P.*, 2022 MT

17

150, ¶ 20, 409 Mont. 318, 514 P.3d 409. The scope of an implied easement is defined by the apparent intent of the landowner who severed the dominant and servient estates and limited to the reasonable uses at the time of severance and future uses the parties may have reasonably expected. *Thomas Mann*, ¶ 25. The party seeking an implied easement has the burden of proof by clear and convincing evidence. *See JRN Holdings, LLC v. Dearborn Meadows Land Owners Ass'n*, 2021 MT 204, ¶¶ 27-29, 38, 405 Mont. 200, 493 P.3d 340; *Frame v. Huber*, 2010 MT 71, ¶ 11, 355 Mont. 515, 231 P.3d 589; *see also Goeres v. Lindey's*, 190 Mont. 172, 177, 619 P.2d 1194, 1197 (1980) ("any implied negative easements . . . are to be considered with extreme caution"). Once established, an implied easement generally "runs with the land," passing through transfer. Section 70-20-308, MCA; *Leichtfuss v. Dabney*, 2005 MT 271, ¶ 37, 329 Mont. 129, 122 P.3d 1220.

¶32     A prescriptive easement is established upon proof by clear and convincing evidence of "open, notorious, exclusive, adverse, continuous and uninterrupted use of the easement claimed for the full statutory period," which, under § 70-19-404, MCA, is five years. *Leffingwell Ranch v. Cieri*, 276 Mont. 421, 426, 916 P.2d 751, 754 (1996); *Wareing v. Schreckendgust*, 280 Mont. 196, 206, 930 P.2d 37, 43 (1996).[14] Courts measure the scope of a prescriptive easement by "the extent of use made during the prescriptive period." *Lyndes v. Green*, 2014 MT 110, ¶ 27, 374 Mont. 510, 325 P.3d 1225. Once established, "the period of prescriptive use by a claimant's predecessors in title inures to the benefit of

---

[14] While an easement by prescription and adverse possession are established in a similar manner, their effect is not the same because adverse possession creates a possessory interest in the subject property, while an easement is a nonpossessory interest. *Habel v. James*, 2003 MT 99, ¶ 14, 315 Mont. 249, 68 P.3d 743.

the claimant." *Renner v. Nemitz*, 2001 MT 202, ¶ 19, 306 Mont. 292, 33 P.3d 255 (citing § 70-19-401, MCA). We have defined the elements of a prescriptive easement as follows: open, notorious, exclusive, adverse, continuous, and uninterrupted use for five successive years. We have defined those elements to mean:

(1)     "Open and notorious" use is "a distinct and positive assertion of a right hostile to the rights of the owner and brought to the attention of the owner," *Lemont Land Corp. v. Rogers*, 269 Mont. 180, 183-84, 887 P.2d 724, 726-27 (1994), and "can be established by showing that the condition of use was so obvious that the owner was not deceived and should have known of the claimant's use," *Albert v. Hastetter*, 2002 MT 123, ¶ 21, 310 Mont. 82, 48 P.3d 749.

(2)     "Exclusive" use means use exercised under a claim of right independent of others, not that the claimant was "the only one" who used the easement. *Lemont*, 269 Mont. at 184, 887 P.2d at 727.

(3)     "Continuous" use is "that which is made often enough to constitute notice of the claim to the potential servient owner" and does necessarily mean "constant use." *Cook v. Hartman*, 2003 MT 251, ¶ 29, 317 Mont. 343, 77 P.3d 231 (citation omitted). "Seasonal uses, intermittent uses, and changing uses all may meet the continuity requirement so long as they are open or notorious." *Cook*, ¶ 30 (citation omitted); *Hays v. De Atley*, 65 Mont. 558, 564, 212 P. 296, 298 (1923) ("[w]hat constitutes continuity of use will depend altogether upon the nature and character of the right claimed").

(4)     "Uninterrupted" use is use not interrupted by an act of the owner of the land or by the claimant's voluntary abandonment. *Cook*, ¶ 32. If the prescriptive easement claimant used the disputed property "whenever he desired, without interference by the owner of the servient estate, the use was continuous and uninterrupted." *Meadow Lake Estates Homeowners Ass'n v. Shoemaker (Shoemaker)*, 2008 MT 41, ¶ 36, 341 Mont. 345, 178 P.3d 81.

(5)     "Adverse" use is use "exercised under a claim of right" and is not permissive use or a license "revocable at the pleasure" of the landowner whose property is burdened by the easement. Further, the servient landowner must know about and acquiesce in the easement claim. *Lemont*, 269 Mont. at 185, 887 P.2d at 727; *Hastetter*, ¶ 28.

19

¶33 Upon proof of open, notorious, exclusive, continuous, and uninterrupted use for five successive years, a presumption of adversity arises that can only be defeated with clear and convincing proof that the claimed adverse use was in fact permissive or by license; however, adversity alone does not establish the other elements. *Hastetter*, ¶ 28; *Shoemaker*, ¶ 50 (citing *Warnack*, 266 Mont. at 216-17, 879 P.2d at 723-24 (the presumption switches the burden to the party opposing prescription to defeat creation of the easement with evidence of permissive use; however, "adversity cannot . . . be presumed from the claimant's inability to prove those remaining elements of prescription")).[15] "If the landowner proves the use is permissive, a prescriptive easement cannot be established" because the entire theory of prescription is based on adverse use. *Wareing*, 280 Mont. at 209, 930 P.2d at 45; *Morrison v. Higbee*, 204 Mont. 515, 520-21, 668 P.2d 1025, 1027 (1983). Evidence of the landowner's "neighborly accommodation or courtesy" may prove permissive use because neither is hostile or adverse. *Heller v. Gremaux*, 2002 MT 199, ¶ 14, 311 Mont. 178, 53 P.3d 1259. However, passive, "implied acquiescence" cannot because it is, in essence, the landowner's failure "to assert his paramount rights against the invasion thereof by the adverse user" and therefore is not the same as an affirmative grant of permission or license. *Cremer v. Cremer Rodeo Land & Livestock Co.*, 192 Mont. 208, 211, 627 P.2d 1199, 1201 (1981); *Lyndes*, ¶¶ 18-19.

---

[15] Where the prescriptive easement claimant shows "an open, visible, continuous, and unmolested use of the land of another for the period of time sufficient to acquire title by adverse possession, the use will be presumed to be under a claim of right, and not by license of the owner." To overcome this presumption and "sav[e] his title from the incumbrance of an easement, the burden is upon the owner to show that the use was permissive." *O'Connor v. Brodie*, 153 Mont. 129, 137, 454 P.2d 920, 924-25 (1969).

¶34 Once perfected, an easement is extinguished only in specific ways, including by abandonment. Abandonment means "a voluntary act involving concurrence of act and intent" with "the act [being] the relinquishment of possession and the intent [being] a manifestation not to resume beneficial use." *Cook*, ¶ 34 (citation omitted). Accordingly, abandonment requires separate proof of both the easement holder's non-use and "intent to abandon," as evidenced by words or acts "of a character so decisive and conclusive as to indicate a clear intent to abandon the easement." *Renner*, ¶¶ 13, 30 (citing *Rieman*, 282 Mont. at 145-46, 935 P.2d at 1125-26); *Shammel*, 144 Mont. at 361-62, 396 P.2d at 107-08 ("periods of nonuser" insufficient alone to establish abandonment). The standard of proof for a claim of extinguishment by abandonment is clear and convincing evidence. *Renner*, ¶ 13.

¶35 An easement may also be extinguished through adverse conduct by the servient landowner, i.e., by so-called "reverse adverse possession" of the easement. *See Shoemaker*, ¶ 36; *Public Lands Access Ass'n v. Boone & Crockett Club Found. (Boone & Crockett)*, 259 Mont. 279, 290-91, 856 P.2d 525, 531-32 (1993) (subsequent acts inconsistent with the claim may show extinguishment (citing § 70-17-111(3), MCA)). The proof required for reverse adverse possession of an easement is the same as the proof required to establish a prescriptive easement, except the roles are reversed and the party trying to extinguish the easement bears the evidentiary burden. *Brimstone*, ¶ 37 (citing *Halverson v. Turner*, 268 Mont. 168, 174-75, 885 P.2d 1285, 1290 (1994) (citing *Shors v. Branch*, 221 Mont. 390, 397-98, 720 P.2d 239, 244 (1986))); *Renner*, ¶¶ 13, 38. The party claiming reverse adverse possession must show by clear and convincing evidence that the

21

claim to extinguish the easement was open, notorious, exclusive, adverse, continuous, and uninterrupted for five years. *Brimstone*, ¶ 37. The question of adverse possession, including "in reverse," is one of intent, "which must be discovered from all the circumstances of the case." *Brimstone*, ¶ 39 (citation omitted).

### B. Overman Failed to Prove Abandonment.

¶36 As a threshold matter, Overman confuses the burdens of proof in this case. She asserts that "Apecellas failed to establish a ditch easement over Overmans' property was not adversely possessed or abandoned." Abandonment requires affirmative proof by the party asserting extinguishment that the easement owner did not use the easement and intended to abandon it; the easement owner does not have a burden to show absence of abandonment. *See Cook*, ¶ 34; *Renner*, ¶¶ 13, 30. Overman identifies the following as evidence of intent to abandon the ditch easement: (1) the Boldts attempted to dry out their property; (2) Anderson intended to use only the Spring Ditch for irrigation, as described on the 2009 subdivision plat; and (3) Kelm "acquiesced" to Overman's control of the ditch.

¶37 Overman asserts that, under *Rieman*, this evidence proves abandonment. However, in that case, evidence of non-use and intent to abandon satisfied the clear and convincing standard. Rieman plugged the ditch at the point of diversion, plowed in his irrigation ditches to install a road, removed several culverts so that no water could flow onto his property, ceased maintaining the ditches, and expressly told neighbors he no longer intended to irrigate his property. *Rieman*, 282 Mont. at 143, 935 P.2d at 1124.

¶38 Here, there was evidence that, sometime shortly before 2005, Ted Boldt Jr. was attempting to dry out the eastern side of his property to pass perc tests for septic and told

22

Darrell Lee about it. But Lee testified Boldt was still irrigating, just not "aggressively." Clint Brown testified that, while he visited Overman between 2003-2010, he witnessed the neighbor flood irrigating with Decker Ditch water using large tarps. Brown also said that, between 2005-2007, when Anderson owned the property, the neighbor asked Overman to stop the flow "temporarily" for perc testing.

¶39   While Anderson testified he tried to dry out the property for subdivision and denied the Ditch in Question ever existed, his testimony was contradicted by Ted and Patty Boldts', Lee's, Belew's, Brown's, and Turek's testimony. Turek opined that the Ditch in Question was used continuously to deliver the water right to the 36-Acre Remainder since 1966 and discounted Anderson's 2009 subdivision plat because it was internally inconsistent and contradicted by historical records and evidence. Turek also said aerial photos from the time contradicted Anderson's claim he did not irrigate the property.

¶40   Finally, Kelm installed an underground pipe on his side of the rock wall to better control the ditch flow to where it converged with the Spring Ditch. He also actively used the Decker Ditch water to irrigate from 2010-2013, until flow "slowed down." When Robinson removed the pipe in the rock wall in 2013, Kelm immediately replaced it. Instead of acquiescing, Kelm demanded his water from Overman and pursued legal remedies until they became financially unsustainable, and his health declined. Even then, he continued to use the "trickle" that came through the Ditch in Question every summer until he sold to Apecellas in 2020.

¶41   This evidence stands in stark contrast to the claimant's proof of abandonment in *Rieman*. Apecellas' predecessors in interest acted in ways inconsistent with the decisive

23

and conclusive intent to relinquish an easement that *Rieman* requires. Moreover, mere periods of reduced flow or mixed maintenance do not satisfy abandonment. *Shammel*, 144 Mont. at 361-62, 396 P.2d at 107-08. Overman's evidence was insufficient to meet the clear and convincing standard of proof. We hold that the District Court correctly rejected Overman's claim of extinguishment by abandonment.

### C. Overman Failed to Prove "Reverse Adverse Possession."

¶42 Overman likewise misstates the burden of proof by asserting that Apecellas failed to prove she did not adversely possess their ditch easement. The burden of proof for extinguishment by reverse adverse possession is on the party asserting it—to prove by clear and convincing evidence that her conduct to extinguish the easement was open, notorious, exclusive, continuous, uninterrupted, and adverse for five years. *Brimstone*, ¶ 37; *Renner*, ¶¶ 13, 38. Each element requires distinct proof and failure to prove any element is fatal to the claim. *See Warnack*, 266 Mont. at 216-17, 879 P.2d at 723-24; *Ray*, ¶ 23; *Wareing*, 280 Mont. at 205, 930 P.2d at 42-43.

¶43 The only element of reverse adverse possession that Overman argued to the District Court was adversity—Overman's "denial . . . of water across [her] property was adverse [from] 2013 to 2021" and "established at least seven years of adverse nonuse and not allowance of use across [her] property."[16] However, we are not convinced Overman

---

[16] Overman faults the District Court here for failing to apply any facts to the elements of "reverse adverse possession" and failing to render any conclusion of law on her "reverse adverse possession" claim. In fairness to the court, Overman did not argue the elements of reverse adverse possession or even call it that. Until briefing on appeal, she called her claim "reverse prescription," which the District Court expressly concluded she failed to prove.

24

established adversity. Instead of continuously denying Kelm water, Overman used the Ditch in Question to irrigate her own property in a manner that permitted water to travel through the ditch and to Kelm's property from 2013 to 2020. Robinson himself installed the pipe in the rock wall to facilitate delivery. Even though he removed the pipe in 2013—a hostile act—Kelm immediately replaced it, and afterward, Overman and Robinson left it there, where it remains today. And even though Robinson installed a control valve at the bifurcation point, he still opened it to fill the Ditch in Question for irrigation—sending water to Kelm's property. He also opened the ditch to Apecellas as soon as they asked for water in 2021.

¶44 Under *Brimstone*, permissive use after a hostile act is insufficient to establish adversity. There, the servient landowner placed a locked gate across a mine-access road on his property but later gave a key to those wanting access. We said this conduct was, "at best," equivocal and not sufficiently hostile or adverse for extinguishment. *Brimstone*, ¶¶ 34-41 (if it was the servient owner's intention to exclude others from the easement, he was obligated "to make that design unequivocally clear"). Here, Overman permitted water to flow to the Apecella Property during Kelm's and Apecellas' ownership. By contrast, when Overman committed to extinguishing Apecellas' ditch easement in May 2021, Robinson filled in the ditch with dirt to cut off *all* water flow to the Apecella Property. This contrast highlights the equivocal nature of Overman's conduct from 2013 to 2021. At most, her evidence shows only periods of episodic adversity.

¶45 Moreover, even assuming arguendo that Overman demonstrated adversity from 2013 to 2021, she failed to establish any other elements of reverse adverse possession.

25

During the relevant period, Kelm continued to receive and use what was sometimes a "trickle" of water, and sometimes "a little more," from the Ditch in Question. Further, Robinson intentionally opened the lateral to deliver water to Apecellas at their request in May 2021. When the flow stopped to the Apecella Property, Robinson worked with Frank Apecella to clear the ditch blockage, after which, the water flowed again. Overman therefore cooperated with Apecellas and facilitated flow during the period she claims she extinguished their ditch easement. This evidence defeats her claims of continuous and uninterrupted, open and notorious, and exclusive extinguishment.

¶46 Overman analogizes Kelm's conduct to the public's "acquiescence" in *Letica Land Co., LLC v. Anaconda-Deer Lodge Cnty.*, 2015 MT 323, 381 Mont. 389, 362 P.3d 614, and *Boone & Crockett* to support her claim of reverse adverse possession, but these cases are distinguishable. These are public-road uniform-exclusion cases; whereas the record here shows intermittent delivery and cooperation. In *Boone & Crockett*, we held that, even if a public prescriptive roadway easement were established over the servient land,[17] the acts of a prior owner were sufficient to extinguish the easement. There, the owner coordinated with Montana's Fish and Game to close off the subject roadway to vehicular traffic with locked gates, thereby restricting access to walk-in traffic only, and law enforcement regularly policed the roadway, issued citations, and ejected trespassers. The owner successfully adversely possessed any easement that might have existed where "the state

---

[17] We held that the parties claiming a prescriptive easement failed to prove their claim where use of the subject road was always permissive and therefore not adverse. *Boone & Crockett*, 259 Mont. at 284-87, 856 P.2d at 527-29.

and local government, as well as the public, cooperated and adhered to the walk-in policy" for 17 years. *Boone & Crockett*, 259 Mont. at 287-90, 856 P.2d at 529-32.

¶47 In *Letica*, servient landowners installed locked gates across a disputed road, removed a culvert permitting road crossing, and advertised in the local newspaper that they were restricting road access. When the restrictions became known to county officials, they took no action. No one ever formally sought or claimed access to the road for almost 30 years. Although some people did cut fences to get around the gates to access their neighboring pastureland, this "occasional public use" was not sufficient to outweigh otherwise continuous adverse possession for a 30-year period. Finding the servient landowners' adverse conduct analogous to that in *Boone & Crockett*, we held it was sufficient to extinguish any public prescriptive easement that might have once existed. *Letica*, ¶¶ 33-49.

¶48 *Letica* and *Boone & Crockett* each establish that reverse adverse possession requires more than sporadic or equivocal adversity. Here, the evidence did not establish continuous, uninterrupted blockage of water to the Apecella Property because water repeatedly reached Kelm from 2013-2020 and Apecellas in 2021. Robinson's own act of facilitating Apecellas' use in 2021 is incompatible with a claim of exclusive possession for five years. The record also does not show a sustained, adverse "gate-control" or uniform posted restrictions for five years; it shows mixed behavior culminating in the 2021 ditch fill. The public road access cases Overman cites turn on uniform, conspicuous exclusion for the statutory period—a burden Overman failed to meet. Because Overman intermittently delivered water to Apecellas, and Kelm regularly received seasonal flow, the record

27

forecloses a five-year run of exclusive, continuous, and uninterrupted acts of extinguishment. Accordingly, Overman failed to prove by clear and convincing evidence all essential elements of her claim of extinguishment by reverse adverse possession. We therefore hold the District Court correctly rejected her reverse adverse possession claim.

¶49 *2. Did the District Court erroneously award Apecellas attorney fees as the prevailing party on their statutory ditch interference claim under § 70-17-112, MCA?*

¶50 Here, the District Court concluded that Apecellas established a ditch easement and secondary right under § 70-17-112(1), MCA; Overman interfered with that right as prohibited by § 70-17-112(2), MCA; and Overman was permanently enjoined from further interference. Accordingly, the court found Apecellas prevailed on every claim they brought under § 70-17-112, MCA—declaration, statutory interference, and injunction— and awarded costs and fees pursuant to § 70-17-112(5), MCA. Overman contends Apecellas were not the "prevailing party" in this dispute and therefore were not entitled to costs and fees. Specifically, she says Apecellas failed to prevail on all their claims, including their intentional interference and nuisance claims. She also asserts that the District Court's finding that Apecellas "abandoned" use of the Ditch in Question to convey more water than could flow through the pipe in the rock wall was a determination in her favor. These arguments fail.

¶51 Section 70-17-112(1), MCA, prohibits interference with ditch easements, providing those persons "with a canal or ditch easement . . . a secondary easement to enter, inspect, repair, and maintain a canal or ditch or to operate the appropriation works." Section 70-17-112(2), MCA, prohibits any person from "encroach[ing] upon or otherwise

28

impair[ing] any easement for a canal or ditch used for irrigation." "If a legal action is brought to enforce the provisions of this section, the prevailing party is entitled to costs and reasonable attorney fees." Section 70-17-112(5), MCA. Under § 70-17-112(5), MCA, a party that "successfully enforces" both (1) the right to a ditch and secondary easement and (2) the prohibition on interference with that right is the "prevailing party." *Sharon v. Hayden*, 246 Mont. 186, 188-90, 803 P.2d 1083, 1085 (1990). Defining the scope of an established easement addresses extent of relief, not liability, and does not defeat prevailing-party status under § 70-17-112(5), MCA. *See Sharon*, 246 Mont. at 190, 803 P.2d at 1085.

¶52 Overman argues that, under *Engel*, *Musselshell Ranch Co. v. Seidel-Joukova*, 2012 MT 222, 366 Mont. 337, 286 P.3d 1212, and *Knudsen v. Taylor*, 211 Mont. 459, 685 P.2d 354 (1984), Apecellas were not the prevailing party, but those cases are distinguishable. First, fees were not awarded in *Engel* because the petitioner did not prevail on all her § 70-17-112 claims. Specifically, Engel did not prevail on all her claims because she failed to prove the respondent's alleged conduct—locking a gate to block vehicular access and letting attack-trained rottweilers run wild on the property—interfered with her secondary right to enter her neighbor's property to inspect, repair, and maintain her ditch easement, as the court found that right to be defined. *Engel*, ¶¶ 6-7, 40-47. This Court emphasized that, to be a "prevailing party" under § 70-17-112(5), MCA, the party must prevail on "*all* claims" brought under the statute. *Engel*, ¶¶ 38-41.

¶53 Second, in *Musselshell Ranch*, the court again denied fees because the plaintiff did not prevail on all claims raised under § 70-17-112, MCA (mixed results on multiple

29

statutory theories),[18] reaffirming *Engel*'s "all claims" rule. *Musselshell Ranch*, ¶¶ 13-28, 25-27. Unlike *Musselshell Ranch*, Apecellas separately asserted distinct claims of "intentional interference with a property right" and "nuisance" seeking compensatory and punitive damages arising out of Overman's alleged tortious conduct but eventually chose not to pursue those claims when the evidence did not support them. Apecellas' tactical decision to forego prosecuting their common law tort claims did not constitute a win for Overman on those claims, or a failure of Apecellas to prevail on their § 70-17-112 claims.[19] Instead, the District Court here found for Apecellas on every § 70-17-112 claim they pursued, satisfying the *Musselshell Ranch* requirement that a party prevail on "all claims" raised pursuant to § 70-17-112, MCA—not merely a "majority." *Musselshell Ranch*, ¶¶ 22-27 (citing *Engel*, ¶ 40).

¶54 Third, *Knudsen* is a mixed-verdict case in which both sides obtained relief (injunctive directions ran against each party) and the court concluded there was effectively no prevailing party for § 70-17-112(5), MCA, purposes. *Knudsen*, 211 Mont. at 463-64, 685 P.2d at 357. This case is not *Knudsen*. *Knudsen* involved a mixed-relief decree; Apecellas obtained all § 70-17-112 relief, and Overman obtained none. Thus, there is no

---

[18] The claimants in *Musselshell Ranch*, ¶¶ 19-21, pleaded multiple claims, all "embedded within" a statutory interference claim under § 70-17-112, MCA; none of the claims asserted "an independent legal basis" for relief or were "posited under a separate and distinct legal theory."

[19] *Accord Graveley Simmental Ranch Co. v. Quigley*, 2003 MT 34, ¶¶ 46-49, 314 Mont. 226, 65 P.3d 225 (regardless of his joint liability for damage on an associated tort claim, claimant was entitled to attorney fees under § 70-17-112, MCA, where he succeeded on "the only claim he brought pursuant to [the] statute").

"victory and loss for both sides" scenario that would defeat prevailing-party status. *Compare Knudsen*, 211 Mont. at 463-64, 685 P.2d at 357.

¶55 Finally, the District Court's tailoring of the scope of the easement to the existing pipe addressed extent of relief, not liability, and did not negate prevailing-party status. The court here found that Apecellas were entitled to delivery of their water right through the Ditch in Question. Apecellas' share of the water right, 127 GPM, was measured at the headgate on Roaring Lion Creek and up to 50% of that water could be lost in the mile between the creek and the Overman/Apecella property boundary. Turek opined the ditch would have to be reconstructed and sized to deliver that volume; Yelin countered that, even if the ditch were enlarged, the pipe size would restrict water delivery. The District Court therefore limited the size of the easement to what could be carried through the pipe in the rock wall. *See Thomas Mann*, ¶ 25 (scope of easement based on use); *Lyndes*, ¶ 27 (same). This decision was not also a determination that Overman "partially prevailed" on her extinguishment claim; the court expressly concluded that she "*failed to prove*" abandonment.

¶56 Accordingly, under *Engel*'s and *Musselshell Ranch*'s "prevail-on-all-statutory-claims" rule—and distinguishing *Knudsen*'s mixed-relief posture—Apecellas are the prevailing party under § 70-17-112(5), MCA. Therefore, we hold the District Court correctly concluded that Apecellas were entitled to reasonable costs and attorney fees. Overman stipulated to the amount of costs and fees in this case, and we therefore do not consider whether the court's award was an abuse of discretion.

31

## CONCLUSION

¶57 We hold the District Court correctly concluded that Overman failed to prove by clear and convincing evidence her asserted claims of extinguishment by abandonment and reverse adverse possession. We further hold that the court correctly concluded that Apecellas were the prevailing party under § 70-17-112(5), MCA, and therefore entitled to reasonable costs and attorney fees.

¶58 Affirmed.

/S/ KATHERINE M BIDEGARAY

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON